**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WEHR CONSTRUCTORS, INC., Respondent.**

No. 96–5358.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 21, 1997.

Decided Oct. 26, 1998.

---

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Charles P. Donnelly, Jr., William M. Bernstein (argued and briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

Andrew J. Russell (argued and briefed), Smith & Smith, Louisville, KY, for Respondent.

Before: SILER, BATCHELDER, and GIBSON,* Circuit Judges.

## OPINION

JOHN R. GIBSON, Circuit Judge.

The National Labor Relations Board seeks enforcement of its Order against Wehr Constructors, Inc., finding that Wehr violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), (3), and (5) (1994). Wehr contests two findings of the Board, both of which center on Wehr's statutory duty to bargain

---

* The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

with the Kentucky State District Council of Carpenters (the Union) on the subject of subcontracting. Wehr argues that: (1) it had no duty to bargain over each individual subcontracting decision made after the Union's certification; and (2) upon the Union's certification, Wehr did not violate the Act by unilaterally changing its subcontracting policies without bargaining with the Union. For the reasons stated below, we deny enforcement of those portions of the Board's order relating to Wehr's subcontracting activities as well as the accompanying make-whole remedy imposed by the Board.[1]

## I.

Wehr, a general contractor, and the Union have been parties to various collective bargaining agreements, the last being a section 8(f) agreement running from June 1, 1986 through May 31, 1989.

Before the May 31, 1989 expiration of the agreement, the parties negotiated in an attempt to secure a renewal agreement. During these negotiations, subcontracting was the major issue. Wehr insisted that it be given the right to subcontract, without restriction, to non-union subcontractors in the area of "Interior Systems"—which includes drywall, metal studs, acoustical ceilings, and flooring. The Union rejected Wehr's position, but expressed a willingness to negotiate to find a solution. Union Organizing Director Lawrence Hujo and Wehr Attorney James Smith met on several occasions before May 31, 1989, but failed to reach an agreement.

On May 25, 1989, Wehr advised the Union that it would no longer recognize the Union following the May 31, 1989 expiration of the

contract. As a result, on May 30, 1989, the Union filed a petition for certification with the Board, and on August 4, 1989, after a Board-conducted election, the Union was certified as the exclusive bargaining representative for Wehr's carpenter employees.

After the collective bargaining agreement expired, the parties continued to unsuccessfully negotiate for a new collective bargaining agreement through April 1990, and discontinued talks until December 1990. Meanwhile, the Union received information that Wehr had subcontracted bargaining unit work at a number of its projects without first bargaining with the Union. In December 1990, the Union began a lengthy process of attempting to obtain information about Wehr's subcontracting activities, and finally received most of its requested information in May 1991. In total, the parties negotiated approximately sixteen times without reaching an agreement.

The Union filed numerous charges against Wehr alleging various unfair labor practices. Based on these charges, the General Counsel issued a complaint on June 5, 1991, alleging that, since the date of Union certification (August 4, 1989), Wehr violated the Act by subcontracting bargaining unit work at various construction projects without affording the Union an opportunity to bargain.

An administrative law judge (ALJ) held a hearing and concluded that "[b]y subcontracting unit work on various projects subsequent to the Union's certification as the employees' collective bargaining agent, [Wehr] violated Section 8(a)(1) and (5) of the Act." The ALJ issued a recommended Order ordering Wehr to cease and desist from "subcontracting bargaining unit work at its construction projects without bargaining in good

1. Wehr does not contest the Board's findings that it violated section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) by failing to furnish the Union with relevant requested bargaining information; by restricting the Union's access to unit employees and job sites; by forcibly removing Union representatives from a job site; by unilaterally paying employees lower or "light commercial" wage rates; and by refusing to bargain in good faith with the Union. Wehr also does not contest the Board's findings that it violated section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by threatening to lay off employees because of the Union and soliciting employees to

abandon the Union in exchange for greater benefits. Finally, Wehr does not contest the Board's finding that Wehr violated section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)) by discharging and failing to rehire employee David Keith because of his union activities. Accordingly, we affirm these findings and enforce those portions of the Board's order designed to remedy these violations. *See NLRB v. Valley Plaza, Inc.,* 715 F.2d 237, 240–241 (6th Cir.1983). Because the only contested issues relate to Wehr's subcontracting activity, we limit our discussion to this area.

faith with the Union" and to "rescind its unilateral implementation of policies relating to the subcontracting of unit work."

Wehr appealed the decision to the Board. On December 16, 1994, the Board issued a Decision and Order adopting the ALJ's conclusion that Wehr violated the Act and ordering Wehr to "[c]ease and desist from ... [s]ubcontracting bargaining unit work at its construction projects without bargaining in good faith with the Union" and to "[r]escind its unilateral implementation of policies relating to ... the subcontracting of unit work." Additionally, the Board ordered Wehr to make whole "all unit employees for any loss of earnings or other benefits suffered as a result of [Wehr's] unlawful ... subcontracting practices."

On appeal, Wehr argues that it did not change its subcontracting procedures upon or after the Union's certification, and thus the Board erred in ordering it to rescind its unilateral implementation of policies relating to the subcontracting of unit work. Wehr also disputes that upon certification it had a duty to bargain with the Union over each individual subcontracting decision. In addition, Wehr argues that the Board erred in directing that Wehr make whole any employees who suffered losses as a consequence of Wehr's alleged unlawful subcontracting.

## II.

■ The NLRB's findings of fact are "conclusive" if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1994). Substantial evidence "means such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quotations omitted). We keep in mind that a reviewing court "may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* at 488, 71 S.Ct. 456. Although we normally review questions of law de novo, the NLRB's interpretation of the act is entitled to deference if it is reasonably defensible. *See Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979).

### A.

Wehr contends that the Board's finding that Wehr violated the Act by unilaterally changing its subcontracting practices is not supported by substantial evidence and is erroneous as a matter of law.

■ Under *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), an employer violates section 8(a)(5) of the Act if it changes existing terms and conditions of employment without first bargaining with the Union.

■ The parties do not dispute that the 1986–1989 contract, which restricted Wehr's ability to subcontract to non-union subcontractors,[2] created a section 8(f) bargaining relationship as opposed to a section 9(a) relationship.[3] Near the end of the

---

2. The 1986–1989 agreement contained the following:

> 1.10: SUB–CONTRACTING–The signatory contractor, who sub-contracts any portion of the work within the jurisdiction of the Union, agrees he will not sub-contract to any person ... unless the aforesaid person ... agrees to observe and be bound by all of the terms and conditions of this Agreement.

3. There are two basic types of bargaining relationships under the Act, namely: (1) a section 8(f) relationship which is established by a "prehire" agreement which results from a contractor's voluntary recognition of a union; and (2) a section 9(a) relationship which results from certification of the union following a Board con-

ducted election in which, by majority vote, the employees select the union as their bargaining representative. *See* 29 U.S.C. §§ 158(f), 159(a) (1994). As the Board stated in *John Deklewa & Sons*, 282 N.L.R.B. 1375, 1987 WL 90249 (1987), *enforced*, 843 F.2d 770 (3d Cir.1988), "Beyond the operative term of the [section 8(f)] contract, the signatory union acquires no other rights and privileges of a 9(a) exclusive representative." *Id.* at 1387. "[U]pon the expiration of [a section 8(f) agreement], the signatory union will enjoy no presumption of majority status, and either party may repudiate the 8(f) bargaining relationship." *Id.* at 1377–78. Unlike section 9(a) agreements, section 8(f) prehire agreements have no "lingering rights and obligations absent an election and certification." *Gottfried v. Sheet Metal Workers'*

1986–1989 contract, Wehr notified the Union that it would no longer recognize the Union following the May 31, 1989 expiration of the contract. When the section 8(f) agreement expired, the Union no longer enjoyed the presumption of majority status and Wehr was relieved of any obligation to bargain with the Union over conditions of employment. *See John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375, 1377–78, 1388, 1987 WL 90249 (1987), *enforced*, 843 F.2d 770 (3d Cir. 1988). From June 1, 1989, until August 4, 1989, the date the Union was certified by the Board, Wehr was free to subcontract with non-union subcontractors without first bargaining with the Union. *See id.; Gottfried v. Sheet Metal Workers' Int'l. Assn. Local No. 80*, 876 F.2d 1245, 1249 (6th Cir. 1989).

■ During this interim period Wehr routinely subcontracted to non-union subcontractors. Upon Union certification, Wehr continued to subcontract to non-union subcontractors. There is no evidence to support the Board's conclusion that Wehr unilaterally changed its subcontracting practices upon or after Union certification.

### B.

■ Wehr also argues that the Board erred in concluding that Wehr violated the Act by subcontracting bargaining unit work at its construction projects after the Union's certification without first bargaining with the Union.

■ An employer violates section 8(a)(5) of the Act if it takes unilateral action regarding a mandatory subject of bargaining without first bargaining to impasse with the certified representative of its employees. *See "Automatic" Sprinkler Corp. v. NLRB*, 120 F.3d 612, 616 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1675, 140

L.Ed.2d 813 (1998). Section 8(a)(5) requires an employer to bargain with its employees' representative about "wages, hours, and other terms and conditions of employment." 29 U.S.C § 158(a)(5) and (d). Congress deliberately used the vague phrase "conditions of employment" to allow the Board substantial latitude in defining the scope of mandatory bargaining, and the Board's determination in this regard is entitled to considerable deference and will be upheld if it is a "reasonably defensible" interpretation of the Act. *See NLRB v. Plymouth Stamping Div.*, 870 F.2d 1112, 1115 (6th Cir.1989); *Ford Motor Co.*, 441 U.S. at 495–97, 99 S.Ct. 1842. However, the Board's judgment is subject to judicial review and will not be enforced where the Board failed to apply the correct legal standard. *See Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. 1842.

The Board found that Wehr's subcontracting "did not alter its basic operation," that Wehr "clearly made its decision [to subcontract] on economic grounds," and that Wehr "replaced its own employees with those of an independent contractor to do the same work." Therefore, relying on *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Board concluded that Wehr's subcontracting of bargaining unit work at its construction projects was a mandatory subject of bargaining.

Wehr disputes that upon certification it was obligated by *Fibreboard* to bargain with the Union to a good faith impasse over *each individual decision* to subcontract to a non-union subcontractor.[4] Wehr argues that the subcontracting at issue here (routine, everyday subcontracting activity of a general contractor) is beyond the scope of *Fibreboard*. Wehr argues that under *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), deter-

---

*Int'l Assn. Local No. 80*, 876 F.2d 1245, 1249 (6th Cir.1989) (quotations omitted).

4. Wehr does not dispute that during negotiations for a collective bargaining agreement an employer has a duty to bargain generally about subcontracting. As the ALJ noted, on numerous occasions prior to the expiration of the 1986–1989 contract; in the period after contract expiration and before Union certification; and after Union

certification; the parties met and engaged in collective bargaining in "which the issue of subcontracting was admittedly the major issue." Rather, Wehr is contesting only that portion of the Board order which can be read to require Wehr to bargain to a good faith impasse over *each individual decision* to subcontract to a non-union subcontractor.

mining whether bargaining is required over these routine, everyday subcontracting decisions depends on an analysis of whether the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business. *See id.* at 679, 101 S.Ct. 2573. Wehr argues that the undisputed evidence affirmatively establishes that bargaining to an impasse over each individual subcontracting decision places an enormous burden on both parties with little or no benefit to the Union, and thus bargaining is not required over each individual subcontracting decision.

The Board argues that Wehr misperceives the factual and legal distinctions between *Fibreboard* and *First National Maintenance.* The Board asserts that the "facts in this case are substantially identical to *Fibreboard*" and that there are "no meaningful distinctions" between this case and *Fibreboard.* Therefore, the Board is not required to "reinvent the wheel" by rebalancing the factors weighing for and against a finding that the decision is subject to mandatory bargaining.

*Fibreboard* involved the subcontracting of maintenance work that its union employees had been performing, without first bargaining with the union, because of the high costs of its maintenance operation. 379 U.S. at 206, 85 S.Ct. 398. The Supreme Court determined that "contracting out of plant maintenance work previously performed by employees in the bargaining unit" fell within the literal meaning of the phrase "terms and conditions of employment," and held that, "on the facts of this case, the 'contracting out' of the work previously performed by members of an existing bargaining unit" is a mandatory subject of collective bargaining. *Id.* at 209–210, 85 S.Ct. 398.

In reaching its conclusion, the Court emphasized that Fibreboard's decision to subcontract did not affect its basic operations and that Fibreboard merely replaced existing union workers with those of an independent contractor to do the same work under similar conditions of employment. 379 U.S. at 213, 85 S.Ct. 398. "Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to man-

age the business." *Id.* Specifically, the Court wrote that it was:

> not expanding the scope of mandatory bargaining to hold, as we do now, that the type of "contracting out" involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of "contracting out" or "subcontracting" which arise daily in our complex economy.

*Id.* at 215, 85 S.Ct. 398.

The record in this case stands in stark contrast to those aspects of *Fibreboard* relating to the contracting of work previously performed by employees in the bargaining unit and the replacement of union workers to do the same work. The only testimony before the Board was to the contrary.

Wehr's Chairman, Claude Berry, testified that Wehr's subcontracting to non-union contractors was concentrated primarily in drywall and casework areas. Berry testified that, due to increased competition from non-union general contractors, Wehr found it necessary to have the flexibility to subcontract to non-union subcontractors, especially in the area of drywall. Berry testified that Wehr had been unable to secure union carpenters sufficiently skilled or sufficiently fast in installing drywall to make Wehr competitive with contractors who employ non-union drywall installers, partly because non-union contractors compensate their installers on a piece-rate or square footage basis, as opposed to an hourly basis. Berry testified that if Wehr was unable to use non-union subcontractors, Wehr would be unable to successfully bid on jobs containing a major drywall portion. If unable to use the lowest drywall bid, Wehr would lose projects to one of the sixteen non-union general contractors in the area, resulting in a loss of jobs to Wehr's union employees. Furthermore, Berry testified that some owners have actively involved themselves in the selection of subcontractors, requiring Wehr to use the low

bidder, and some have made specific requirements as to casework.

During general subcontracting negotiations, Wehr proposed to the Union that the drywall issue be resolved by compensating union drywall installers on a piece rate basis. The Union rejected this proposal. Wehr also proposed completely eliminating a subcontracting clause, which the Union also rejected. Wehr argues that negotiating over individual subcontracting would be of no benefit to the Union because it would not cause Wehr to use its own work force, because doing so would, as Berry testified, cause Wehr to bid unsuccessfully and lose jobs. Berry's testimony concerning the economic significance and impact of subcontracting was not contradicted. The ALJ, in discussing subcontracting, made no findings either accepting or rejecting Berry's testimony.

In *First National Maintenance*, the Court examined whether an employer must negotiate with the certified representative of its employees over a decision to close a part of its business. 452 U.S. at 667, 101 S.Ct. 2573. In considering whether the decision was a mandatory subject of bargaining, the Court wrote:

> The concept of mandatory bargaining is premised on the belief that collective discussions ... will result in decisions that are better for both management and labor.... This will be true, however, only if the subject proposed for discussion is amenable to resolution through the bargaining process. Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business.... [I]n view of any employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective bargaining process, outweighs the burden placed on the conduct of the business.

452 U.S. at 678–79, 101 S.Ct. 2573 (internal citations omitted).

The Court further stated that *Fibreboard* "implicitly engaged in this analysis" when it concluded that the company's decision to con-

tract out the maintenance work did not alter the company's basic operation, the work still had to be performed in the plant, and the company merely replaced existing employees with those of an independent contractor. *Id.* at 679, 101 S.Ct. 2573. "Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." *Id.* at 680, 101 S.Ct. 2573 (quoting *Fibreboard*, 379 U.S. at 213, 85 S.Ct. 398).

■ As *Fibreboard* and *First National Maintenance* make clear, a decision to subcontract is not necessarily subject to mandatory collective bargaining; whether such bargaining is mandatory can only be answered by looking to the particular facts presented in the individual case. *See First National Maintenance*, 452 U.S. at 686 n. 22, 101 S.Ct. 2573 ("In this opinion we of course intimate no view as to other types of management decisions, such as ... other kinds of subcontracting, ... which are to be considered on their particular facts."); *Fibreboard*, 379 U.S. at 215, 85 S.Ct. 398. Considering the facts of the particular case, the court should consider whether the matter is "peculiarly suitable for resolution within the collective bargaining framework" and "amenab[le] ... to the collective bargaining process." *First National Maintenance*, 452 U.S. at 680, 101 S.Ct. 2573 (quoting *Fibreboard*, 379 U.S. at 211, 214, 85 S.Ct. 398).

■ As *First National Maintenance* sets out, the standard for determining whether the subject is suited for resolution through the collective bargaining process, and thus a mandatory subject of bargaining, is whether the "benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *First National Maintenance*, 452 U.S. at 679, 101 S.Ct. 2573; *see also Fibreboard*, 379 U.S. at 213–214, 85 S.Ct. 398; *Plymouth Stamping*, 870 F.2d at 1115.

Here, the Board failed to conduct this balancing test, relying solely on *Fibreboard*. We reject the Board's statement that the present case is "substantially identical" to, and has "no meaningful distinctions" from, *Fibreboard*. It is true that in both cases

labor costs motivated the employer to subcontract, that the company's employees were capable of performing the work, and that the company's decision to subcontract did not alter its basic operation. *See Fibreboard,* 379 U.S. at 213, 85 S.Ct. 398. However, in *Fibreboard,* the work that was being "contracted out" had previously been performed by the company's union employees, the work still had to be performed within the plant, and the company replaced existing employees with those of an independent contractor. *Id.* Here, the undisputed evidence indicates that the work Wehr subcontracted after union certification was not already being performed by the Union's employees, and no evidence was presented that showed Wehr's continuation of its previously lawful subcontracting activity caused Wehr to replace any existing Union employees.[5] Furthermore, the subcontracting decision in *Fibreboard* was a one time decision to replace maintenance employees at a particular plant with those of a non-union subcontractor. *Id.* Here, the subcontracting at issue relates to numerous and routine everyday decisions by a general contractor to subcontract work at certain of its construction projects.

In these circumstances a strict reliance on *Fibreboard* is misplaced, especially considering *Fibreboard* specifically limited its holding to its particular facts. 279 U.S. at 215, 49 S.Ct. 308. As the Board stated in *Shell Oil Company,* 149 N.L.R.B. 305 (1964), in reference to its earlier decisions in *Fibreboard* and *Town & Country Manufacturing Co.,* 136 N.L.R.B. 1022 (1962), *enforced,* 316 F.2d 846 (5th Cir.1963):

> The principles of these earlier cases, however, are not meant to be hard and fast rules to be mechanically applied irrespective of the circumstances of the case. In applying these principles, we are mindful that the permissibility of unilateral subcontracting will be determined by a consideration of the setting of each case. Thus, the

amount of time and discussion required to satisfy the statutory obligation ... may vary with the character of the subcontracting, the impact on employees, and the exigencies of the particular business situation involved. In short, the principles in this area are not, nor are they intended to be, inflexibly rigid in application.

*Shell Oil,* 149 N.L.R.B. at 307.

The ALJ, in concluding that bargaining was mandatory, simply stated that, like *Fibreboard,* Wehr's decision to subcontract the work did not alter its basic operation; the work still had to be done, and the employer replaced its own employees with those of an independent contractor to do the same work.

■ We recognize that a decision to subcontract based upon a desire to reduce labor costs is generally considered a matter suitable for resolution within the collective bargaining framework. *See Fibreboard,* 379 U.S. at 214, 85 S.Ct. 398; *Olivetti Office U.S.A., Inc. v. NLRB,* 926 F.2d 181, 186 (2d Cir.1991); *Plymouth Stamping,* 870 F.2d at 1116. The cost of labor on a particular job is obviously within the control of the Union and therefore may be overcome through collective bargaining. As this court observed, "The purpose of the duty to bargain is to give the collective bargaining process a chance to operate regardless of the possibility of success. To hold otherwise would allow employers and unions to skip the bargaining stage altogether based upon their own perceptions regarding the low probability of reaching an agreement." *Plymouth Stamping,* 870 F.2d at 1117 n. 2.

However, because the decision to subcontract is driven by labor costs does not automatically mean that bargaining over each individual contract is mandatory. This benefit to the collective bargaining process must still be weighed against the burden on the conduct of the company's business. *See First National Maintenance,* 452 U.S. at 679, 101 S.Ct. 2573; *Fibreboard,* 379 U.S. at

---

5. The fact that Wehr was, upon Union certification, already legally subcontracting to non-union subcontractors is relevant because, as the Board stated in *Westinghouse Electric Corp.,* 150 N.L.R.B. 1574, 1576 (1965), "[A]n employer's duty to give a union prior notice and an opportunity to bargain normally arises where the employer proposes to take action which will effect some change in existing employment terms and conditions within the range of mandatory bargaining." Here, Wehr is not proposing to make a change in its subcontracting procedures, but rather is continuing its previous lawful subcontracting practice.

213, 85 S.Ct. 398; *Olivetti,* 926 F.2d at 186; *Plymouth Stamping,* 870 F.2d at 1116.

Courts faced with the issue of subcontracting motivated by labor costs have generally concluded that the benefit from bargaining outweighs any burden to the employer's business because "bargaining about the matter would not significantly abridge [the employer's] freedom to manage the business." *Fibreboard,* 379 U.S. at 213, 85 S.Ct. 398; *see, e.g., Olivetti Office,* 926 F.2d at 186 ("Obviously, labor costs were the driving force behind the Company's action, and the problem was particularly suited to resolution through collective bargaining. Balancing this benefit ... against a possible burden on the conduct of the Company's business, it is clear the Company's course of conduct would not have been unduly hampered by bargaining.")

Although this may generally be the case, the undisputed evidence in this case conclusively establishes that bargaining over each individual subcontracting decision would severely hamper Wehr's ability to conduct its business. Union representative Larry Hujo, when asked whether the Union had any desire to negotiate with Wehr concerning each individual decision to subcontract, testified that "Our desire was to have a sub-contracting provision.... [Y]ou're talking about an astronomical feat to try to bargain over each individual subcontractor, to talk about it." Hujo agreed that bargaining over each individual subcontracting decision would require a "tremendous amount of time." To hold that Wehr must bargain over each and every decision would severely restrict Wehr's ability to do business on a day-to-day basis.

The Board thus relied solely on *Fibreboard* as the foundation for its order, improperly rejecting Wehr's argument that the *First National Maintenance* balancing test should be applied. The Board's decision is silent with respect to Berry's uncontradicted testimony on the nature of the subcontracting and Hujo's testimony confirming the substantial burdens that would be imposed as a result of bargaining over each individual decision to subcontract. Under these circumstances, we conclude the Board's order cannot stand and must not be enforced.

Our discussion could stop at this point. We add, however, that if we were to consider the entire record before the Board and apply the *First National Maintenance* balancing test, we would be required to conclude that bargaining over each specific subcontracting decision would significantly abridge Wehr's ability to manage its business. This, in conjunction with Hujo's testimony, would compel us to conclude that this burden outweighs the benefit such bargaining would provide to the collective bargaining process.

For the reasons stated above, we conclude the Board erred in finding that Wehr violated the Act by subcontracting bargaining unit work at certain of its construction projects without bargaining in good faith with the Union, and we refuse to enforce the Board's Order ordering Wehr to "[c]ease and desist from ... subcontracting bargaining unit work at its construction projects without bargaining in good faith with the Union."

### III.

The Board, finding that Wehr violated section 8(a)(5) of the Act by subcontracting bargaining unit work at its construction projects after the Union's certification, directed Wehr to make whole, with interest, any employees who suffered losses of wages and other benefits as a result of Wehr's subcontracting. Because we have refused to enforce those portions of the Board's Order, we refuse to enforce this portion of the Board's Order.

### IV.

For the foregoing reasons, we enforce the uncontested portions of the Board's Decision and Order. We deny enforcement of the portion ordering Wehr to rescind its unilateral implementation of policies relating to the subcontracting of unit work, and the portion ordering Wehr to cease and desist from subcontracting bargaining unit work at its construction projects without bargaining in good faith with the Union. Additionally, we deny enforcement of the make-whole remedy imposed.