RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

FIRSTENERGY GENERATION, LLC, a wholly owned subsidiary of FirstEnergy Corporation,

　　　　　　*Petitioner/Cross-Respondent*,

　　*v.*

NATIONAL LABOR RELATIONS BOARD,

　　　　　　*Respondent/Cross-Petitioner*.

> Nos. 18-1654/1782

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
Nos. 06-CA-163303; 06-CA-170901.

Argued: May 9, 2019

Decided and Filed: July 2, 2019

Before: SUHRHEINRICH, BUSH and READLER, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Peter N. Kirsanow, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Cleveland, Ohio, for Petitioner/Cross-Respondent. Barbara Ann Sheehy, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Peter N. Kirsanow, Richard E. Hepp, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Cleveland, Ohio, for Petitioner/Cross-Respondent. Barbara Ann Sheehy, Usha Dheenan, David Habenstreit, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

———————————————

**OPINION**

———————————————

SUHRHEINRICH, Circuit Judge.   An employer violates the National Labor Relations Act when it takes unilateral action relative to any mandatory subject of collective bargaining. *See NLRB v. Katz*, 369 U.S. 736, 743 (1962).   In this case the International Brotherhood of Electrical Workers, Local 272, AFL-CIO (Union) accused the employer FirstEnergy Generation, LLC (Company) of two such infractions: implementing terms and conditions of employment that were inconsistent with the Company's final impasse offer during collective bargaining negotiations; and unilaterally subcontracting out periodic maintenance work historically performed by union employees.   The National Labor Relations Board (Board) affirmed an administrative law judge's findings in favor of the Union on both charges.   The Company filed this petition for review, and the Board has filed a cross-application to enforce the Board Order issued against the Company.   For the reasons to follow, we **AFFIRM in PART** and **REVERSE in PART**.

## I.  BACKGROUND

### A.  The Parties

The Company operates coal-fired power generation facilities throughout Ohio and Pennsylvania, including the Bruce Mansfield Plant in Shippingport, Pennsylvania.   The Bruce Mansfield facility is home to three identical power generating units, referred to as Unit 1, Unit 2, and Unit 3.   Each unit consists of a turbine, a generator, a boiler, valves, and other auxiliary equipment.

The Union represents a bargaining unit of 230 production and maintenance employees at the Bruce Mansfield Plant.   The parties' most recent collective bargaining agreement was effective from December 5, 2009, to February 15, 2013.   On August 16, 2012, the parties extended the agreement to February 14, 2014.

**B. Negotiating a New Agreement**

*December 19, 2013.* The parties began negotiations for a successor collective bargaining agreement. A central concern was the Company's desire to eliminate retiree health care benefits for employees who retired during the term of the agreement, known as "in-the box" retirement benefits.[1] The Union objected to the elimination of the in-the-box retiree benefits and sought additional compensation as recompense. The Union also sought wage parity between the Bruce Mansfield plant and the Sammis facility, another Company power plant in Stratton, Ohio. They met numerous times until they reached an impasse in October 2015.

*September 25, 2014.* The Company presented the Union with a Comprehensive Offer of Settlement. The Company's offer proposed eliminating health benefits for "in-the-box" retirees as of December 31, 2014. The offer also proposed the following annual wage increases, referred to as General Wage Increases (GWIs): 1.5% GWI effective the date of ratification; an additional 1% GWI effective one year following the date of ratification; and an additional 1% GWI effective two years following the date of ratification. This offer also proposed increasing the shift differentials paid to employees for hours worked during the afternoon and evening shifts, and on Sundays, all effective upon ratification.

The Union rejected the offer.

*December 8, 2014.* Charles Cookson, Executive Director of Labor Relations and Safety for the Company, verbally modified the Company's September 25, 2014 offer in response to Union President Herman Marshman's concerns that the proposed equity adjustment "was not near enough." Cookson offered an HSA [employee health savings account] or 401(k) contribution and two options for increased wages:

---

[1]The parties' agreement allowed current employees who retired during the term of the agreement to continue participating in their chosen health benefit plan until the agreement expired, with the Company paying a portion of their health care and prescription drug coverage costs. The parties refer to these as "in-the-box" retirees because the amount the Company paid was set forth in a box chart in the collective bargaining agreement. When the agreement expires, these retirees come "out of the box" and are eligible to enroll in a different, higher-cost company health care plan.

1.      A contribution of $500 for those with individual health care coverage and $1000 for EE/Spouse, EE/Child and family coverage to the HSAs [employee health savings accounts].  If they do not participate in a FirstEnergy HSA, the money would be placed in their 401k account.  This would be in each year of the contract.  *In addition, you can choose one of the options from below*:

2.      If you end the new retiree health care box 12/31/14 we would provide a general wage increase in each year of the contract as follows:

   a.   3.0% at ratification
   b.   2.5% one year after ratification
   c.   2.5% two years after ratification
   d.   In addition we would provide a $.75 equity adjustment to all classifications at the time of ratification

3.      If you end the new retiree health care box 12/31/15 we would provide a general wage increase in each year of the contract as follows:

   a.   2.5% at ratification
   b.   2.0% one year after ratification
   c.   2.0% two years after ratification
   d.   In addition we would provide a $.75 equity adjustment to all classifications at the time of ratification.

(Emphasis added.)

The Union rejected this offer as well.

*July 7, 2015.*  Cookson presented another proposal to Marshman.  The written summary omitted the proposal regarding termination of retiree benefits by the end of 2014, presumably because the deadline had passed, and thus included only the proposal to terminate benefits by December 31, 2015.  Cookson stated that the proposal to maintain the current pension plan for existing employees but establish a cash-balance retirement savings account for new hires was a carry-over from the September 25, 2014 Comprehensive Offer of Settlement.

Marshman asked that the Company maintain retiree health benefits until the end of 2017, increase wages by 12% (as an equity adjustment), and provide a 3% GWI upon ratification.  Marshman rejected the cash-balance retirement plans proposal.  Cookson responded that the Company could not extend retiree health benefits beyond 2015; the Union's equity adjustment was too large; and the Company had to have cash-balance retirement plans for new hires.

Cookson also told Marshman that the Company would need expanded resource sharing, and mobile maintenance.

*July 21, 2015.* Cookson and Marshman met again. The Company revised its September 25, 2014 and December 8, 2014 proposals in a document entitled "Summary of New Proposals and Revisions to 9/25/14 Company Comprehensive Proposal and 12/8/14 proposals provided to Union 7/21/15." The Company maintained its proposal to end in-the-box benefits, but as of October 31, 2015, rather than the previously-proposed date of December 31, 2015. On the other hand, the Company increased the equity adjustment from $.75 to $1.00 per hour for all classifications, effective upon ratification; and now offered a GWI of 5.5% effective at ratification; and 2% one year after ratification. The Company maintained its earlier proposals regarding HSA and 401(k) contributions and new hires being placed in a cash-balance plan. Cookson also provided proposals regarding resource sharing and mobile maintenance.

Cookson's notes reflect that when asked by Marshman, "Why did the Company propose a $1.00 equity adjustment versus a % increase for equity?", Cookson replied: "It was because we started initially proposing equity adjustments at cents per hour. Note: *the equity along with the 5.5% GWI this would result in an immediate 8.5% (approximate) increase for everyone at ratification.*" (Emphasis added.) Marshman, for his part, insisted that the retiree health benefits continue through December 2017; and that the Company needed to provide larger compensation for termination of those benefits. He rejected the cash-balance plan and expressed concern with the Company's proposals regarding resource and mobile maintenance proposals.

*August 20, 2015.* Cookson's notes from the August 20, 2015 meeting reflect that he recapped the disputed issues from the July 21 meeting and indicated that the Company had flexibility on the agreement duration and wages. Marshman reiterated that retiree health care had a monetary value and that the Company should provide the savings from the termination of this benefit to the retirees. Cookson transcribed the following exchange:

(CC) Our position is that it (the box) will end and go away. We are proposing to give $$ to the active employees. We have a fundamental disagreement. We are eliminating this across the board.

(HM) Not trying to be unreasonable, this is not favorable for us. If I could get something, we could move on.

(CC)   In this area I cannot do any more than I have already offered.

(HM)   How do we get around this?

(CC)   *We have offered other things—like an initial 8.5% wage increase.*

(Emphasis added.)  Marshman and Cookson also discussed the Company's resource sharing and mobile maintenance department proposals, but did not agree, and decided to return to the bargaining table with the committees.

*September 17-18, 2015.*  The Company gave the Union its Second Comprehensive Offer of Settlement.  The document was a red-lined version of the parties' collective bargaining agreement, with the revisions Cookson had given Marshman on July 21.  As the "Summary of Main Points of Company Comprehensive Offer #2" makes clear, there were no substantive changes.  The Union rejected it.  The session ended without agreement on wages, retiree health care, cash-balance pension plans, mobile maintenance, or resource sharing.

The Union canceled the next bargaining session set for October 19, 2015 because Marshman fell ill.  After the Union failed to offer alternate dates, the Company declared an impasse.

*October 27, 2015.*  The Company gave the Union a package of related documents, including one entitled "Summary of Implemented Terms."  The Company indicated that it: was ending retiree health subsidies for all in-the-box retirees by December 31, 2015; would make annual contributions for current employees of $500 or $1000 depending on health insurance coverage toward HSAs or 401(k)s beginning January 1, 2016; and would enroll new hires in a cash-balance retirement plan as of January 1, 2016.  The Summary did not implement wage increases (GWI and equity adjustment) or shift differential proposals.  The Company also did not implement its mobile maintenance proposal.  In response, the Union filed an unfair practice charge challenging the Company's implementation of its last offer.

## C. Subcontracting the Outage Work

Meanwhile, the Company was planning an outage, or shutdown, of Unit 1 (M116 Project), which entailed opening and disassembling the turbine-generator unit, inspecting and cleaning its parts, and then reassembling and closing the unit (referred to as "open/clean/close

work"). The Company conducts one of these full-scale outages every nine years. Historically, the bargaining unit employees at Bruce Mansfield have performed all the open/clean/close work during outages. However, the Company has contracted out certain specialized work such as engineering, sandblasting, coating, painting, insulation, pipefitting, and non-destructive testing.

According to the Company, this outage was at least ten times larger than the most recent outage of Unit 3 in 2014 and was the largest turbine outage in about ten years. Bargaining unit employees had previously performed 150 of the 600 discrete tasks involved in the M116 Project.

The Company had 56 days to complete the M116 Project or face fines and penalties. It contemplated three workforce options: bargaining unit employees, the mobile maintenance department, or outside contractors. The Company decided that there were not enough bargaining unit employees to perform the outage work while also performing the daily maintenance work on the other two units. The Company also decided against using its mobile maintenance department because it might jeopardize ongoing negotiations with the Union. This left option three: subcontracting the work. The Union was not involved in any of these discussions.

The Company sought a bid from General Electric, the original manufacturer of the turbine-generator units. GE had also provided technical direction during prior outages. GE made a bid in late February 2015, which allegedly included a two-year warranty on any work performed. On November 13, 2015, the Company signed a purchase order with GE to perform the outage work on Unit 1, including the open/clean/close work previously performed by bargaining unit employees, at a cost of nearly $4 million.

On February 10, 2016, the Company held a contractors' information meeting with the Union. Maintenance Superintendent Paul Rundt and Maintenance Manager Christopher Cox notified Union Secretary Dennis Bloom, and Union Steward Frank Snyder that the Company had contracted out the open/clean/close work to GE.[2] Later, Rundt informed the Union that the Company would use bargaining unit employees to perform the boiler feed pump work, but that GE would perform the outage work. Marshman requested information about all contractors who

---

[2]Cox and Rundt both testified that Rundt merely stated that the Company "was intending" to subcontract the turbine outage work. The administrative law judge discredited Rundt's version of events and instead credited Bloom's testimony that the decision to subcontract the turbine outage work to GE as a final decision.

would be performing the Unit 1 Outage work, but the Company provided only partial information.

The M116 Project began on March 20 and ended on May 14, 2016. GE performed the open/clean/close work on the turbine-generator unit. No bargaining unit employees performed any turbine overhaul work. Bargaining unit employees performed the boiler feed pump work. During this period, all available bargaining unit employees worked, including voluntary and involuntary overtime.

The Union filed another unfair-labor-practice charge.

### D. Board Decision and Order

The administrative law judge held that the Company violated Section 8(a)(5) and (1) of the Act.[3] On May 16, 2018, the Board issued its Decision and Order finding that the Company violated Section 8(a)(5) and (1) of the National Labor Relations Act by (1) unilaterally implementing provisions from the September 17, 2015 Second Comprehensive Offer of Settlement that were inconsistent with the final, pre-impasse offer by eliminating in-the-box retiree health benefits without also implementing the proposed general wage increases, equity adjustments, and shift differentials; (2) refusing to bargain with the Union by unilaterally changing wages, hours, or other terms and conditions of employment of bargaining unit employees, including subcontracting of bargaining unit work associated with M116; and (3) refusing to give the Union requested information about the wages and material costs paid to subcontractors.

The Board's Order requires the Company to (1) cease and desist from the unfair labor practices; and (2) bargain with the Union before implementing changes, and upon the Union's request and at its option, either reinstitute the in-the-box- retiree health benefits or implement the GWIs, equity adjustments, and shift differentials that should have accompanied the health savings accounts and 401(k) payments, retroactive to the date the Company eliminated the in-the-box retiree benefits. The Order also requires the Company to make current and former

---

[3]*Codified as amended* at 29 U.S.C. §158 (a)(5), (a)(1).

employees whole for losses incurred by the foregoing unfair labor practices, including the Company's unilateral subcontracting of bargaining unit work associated with the M116 Outage.[4] Finally, the Company is required to honor the Union's February 10, 2016 information request and post a remedial notice.

The Company then filed this petition for review of the Board's Order, and the Board filed its cross-application to enforce the Board's Order.

## II. STANDARDS OF REVIEW

The Board's factual findings are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted). Although questions of law are usually reviewed de novo, the Board's interpretation of the Act "is entitled to deference if it is reasonably defensible." *NLRB v. Wehr Constructors, Inc.*, 159 F.3d 946, 950 (6th Cir. 1998) (citations omitted).

We "may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488. Stated another way, "[w]e need not agree that the Board's construction is the '*best* way' to read the NLRA, but rather leave it to the Board to balance 'conflicting legitimate interests in pursuit of the national policy of promoting labor peace through strengthened collective bargaining.'" *Kellogg Co. v. NLRB*, 840 F.3d 322, 327 (6th Cir. 2016) (quoting *Montague v. NLRB*, 698 F.3d 307, 314 (6th Cir. 2012)). And yet, "this court must not stand back and 'rubber-stamp' Board decisions that controvert the NLRA; instead it must carefully scrutinize accusations that the Board failed to abide by precedent." *Id.* (citation omitted).

---

[4]The project was completed by the time of this ruling.

## III.  ANALYSIS

### A.  Post-Impasse Terms

Under Section 8(a)(5) of the Act, an employer commits an unfair labor practice by "refus[ing] to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5); *see also id*. § 158(a)(1) (making it unlawful for an employer to "to interfere with, restrain, or coerce employees in the exercise of" their rights under the Act).  The obligation to "bargain collectively" requires an employer to "confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ."  *Id*. § 158(d).  An employer thus violates Section 8(a)(5) if it unilaterally changes existing terms or conditions of employment prior to bargaining to impasse.  *United Paperworkers Int'l Union v. NLRB*, 981 F.2d 861, 866 (6th Cir. 1992).  After the parties have bargained to impasse, however, an employer may lawfully make unilateral changes "that are reasonably comprehended within [its] pre-impasse proposals," *United Paperworkers*, 981 F.2d at 866 (emphasis omitted; citations omitted), "and are consistent with the offers the Union has rejected."  *NLRB v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1326 (6th Cir. 1995) (citation omitted).  However, "the employer may not implement changes which are substantially different from . . . any which the employer has proposed during its negotiations"  *Id.* (internal quotation marks and citation omitted).  Thus, selectively implementing proposals that are "inextricably linked" with unimplemented proposals violates the Act.  *See Plainville Ready Mix Concrete Co.*, 309 NLRB 581, 588 (1992), *enforced,* 44 F.3d 1320 (6th Cir. 1995).

As noted, the Board accepted the administrative law judge's findings and theory that the Company violated Section 8(a)(5) and (1) of the Act by failing to implement the wage increases and shift differentials set forth in its Second Comprehensive Offer because they were "inextricably intertwined" with, and a *quid pro quo* for, the Company's proposal to eliminate retiree health benefits.  The Company contends no reasonable fact-finder could conclude that the proposed cash benefit condition upon ratification was "inextricably linked" to retiree health care.

In *Plainville*, pre-impasse the employer proposed lower fixed hourly wage rates combined with supplements to gain sharing and incentive pay plans designed to offset the

difference. *Plainville*, 309 NLRB at 584. In its final, pre-impasse offer, the employer offered a wage increase, "in lieu of gain sharing and incentive pay." *Id.* However, after impasse, the employer implemented the lower hourly wage rates, not the wage increase, unaccompanied by incentive pay and gain sharing. *Id.* The Board found that the employer violated the Act because the lower wage rates alone were not "reasonably comprehended" in the final offer but were part of a package with gain sharing and the incentive pay plans. *Id.* at 586. In other words, the stand-alone lower wages rates were a different animal than what was presented to the union, which deprived it of notice or an opportunity to respond. *See id.*

This court fully enforced the Board's decision because this factual determination was supported by substantial evidence in the record. *See Plainville*, 44 F.3d at 1328, 1340. We also focused on whether the employer "treated the . . . proposed increase in the fixed hourly wage rate as *quid pro quo* for the . . . elimination of the gain sharing, and incentive pay plans" and "put forth these two components . . . as a comprehensive, integrated wage offer." *Id.* at 1328. We found that the wage proposals were "consistently linked" components of a comprehensive, integrated wage offer, leading the union to "reasonably comprehend" that if gain sharing and incentive pay were eliminated, then the employer would implement the proposed wage increases. *Id.* Accordingly, we held that choosing to implement only one part of the deal was unlawful.[5] *Id.* at 1340.

The Board felt that the principles of *Plainville* signaled a violation in this case. Substantial evidence supports its conclusion. First, as the Board found, the Company's December 8, 2014 verbal offer of wage increases was precipitated by the Union's complaints about insufficient incentive to terminate retiree health benefits. That is, the wage increases were offered for the first time on December 8, "as part of an overall package to compensate the Union for the elimination of 'in-the-box' retiree health benefits." Cookson's description of his verbal proposal supports the Board's finding:

---

[5]The Company argues that *Plainville* does not apply because in that case, when the employer offered wage increases it explicitly stated in a written memo to employees that the wage increases were "in lieu of gain sharing and incentive pay." *See* Plainville, 44 F.3d at 1324–25, 1340. But nothing in that opinion suggests that a particular phrase is required. Rather, the *Plainville* court based its conclusion on the parties' bargaining history, the employer's conduct, and the union's reasonable understanding of the employer's conduct.

At the time it was December of 2014. In our September proposal we had proposed that retiree health care would end at the end of the year, end of 2014, and the union wanted that to go beyond 2014. So at the time what we said was, "You can have more wages if it ends right now at the end of this year, or you can have lesser wages at the end of 2015," in the sense of 3 percent upon ratification, 2.5 percent one year after ratification, 2.5 percent two years after ratification if retiree health care ended at the end of 2014. The offer would be 2.5 percent at ratification, 2.0 one year after, and 2.0 percent two years after if retiree health care was moved onto the end of 2015.

As the Board put it:

[T]he provision of these employment benefits [i.e. the wage increases] was explicitly contemplated as a way for the [Company] to help employees offset the increased costs employees would face upon the termination of "in-the-box" health benefits, and to allow employees to share in some of the cost savings brought about by the elimination of the benefits.

Furthermore, during the December 8 bargaining session, Cookson explicitly told Marshman that, he was "offering 80% back to you" with the proposed wage increases.

There is also record support for the Board's finding that the Company continued to tie wage increases to the elimination of retiree health benefits. The July 7, 2015 proposal reduced the Company's December 8, 2014 verbal proposal to writing without divorcing the tie between elimination of retiree benefits and wage increases. In fact, the July 7, 2015 summary continues to directly link the elimination of retiree benefits to the GWIs—"Retiree Medical Box ends 12/31/15 (2.5%, 2.0% and 2.0%)." In the July 21, 2015 summary of new proposals, the Company increased the equity adjustment of its proposal from $.75 to $1.00 an hour, increased the GWI to 5.5% at ratification and 2.0% one year after ratification, and ended the retiree medical box on October 31, 2015. The GWIs and elimination of retiree benefits are no longer listed together on the same line, but there is no clear indication that the Company was changing the *quid pro quo* nature of its December 2014 proposal. Cookson's notes from the July 21, 2015 meeting reflect that the parties continued to discuss equity adjustments, GWIs, and elimination of retiree benefits in tandem. When Marshman asked Cookson, "Why did the Company propose a $1.00 equity adjustment versus a % increase for equity?", Cookson responded, "It was because we started initially proposing equity adjustments at cents per hour. Note: the equity along with the 5.5% GWI this would result in an immediate 8.5% (approximate) increase for everyone at

ratification."  Thus, Cookson himself linked the GWI increase and equity adjustment as a bundle, in return for the Company's desired proposal of ending in-the-box benefits as of 10/31/15.

As the Board found, Cookson underscored this continuing link at the August 20, 2015 meeting when, in response to Marshman's question how they could  "get around [the disagreement over eliminating retiree benefits]?", Cookson said, "We have offered other things—like an initial 8.5% wage increase."  Further, as the Board found, the Company never withdrew its proposal, or otherwise let the Union know that it was no longer proposing wage increases to compensate for the elimination of retiree benefits.  At the September meeting, it did not modify its proposals or tell the Union that it would eliminate retiree benefits without implementing the proposed increases.  Based on these uncontested facts, substantial evidence supported the Board's finding that the Company "consistently proposed tying and offsetting the elimination of employees' 'in-the-box' retiree health benefits with annual contributions to employees' [HSAs] or 401(k) accounts, general wage increases, equity adjustments, and shift differentials."

*Wage Parity.*  The Company claims that the record is replete with testimony from both the Company and Union witnesses that achieving wage parity between Bruce Mansfield employees and Sammis employees had been a consistent theme throughout negotiations, and that "[t]his crucial point, standing alone, undercuts the theory that the wage increases were 'inextricably intertwined' with, of all things, retiree healthcare."  In support, the Company points to the Board's finding that the Company's proposed wage increases were directly tied to the wages paid at the Company's other locations, and not to retiree medical benefits, because, as the Board stated, the thrust of the Company's equity adjustment proposals was "to bring them closer to the Sammis employees."  The Company also relies on the administrative law judge's finding that "[t]he Union wanted to bring wages at the Bruce Mansfield facility closer to those at the Sammis facility."

But the Board "rejected [the] contention" that the equity adjustment proposal was linked exclusively to closing the wage gap as "contrary to the overwhelming evidence."  As the Board noted, although Marshman complained throughout about wage disparity between the Bruce Mansfield and Sammis facilities, he never abandoned his position regarding the elimination of

retiree benefits. More accurate is the Board's finding that "a proposed wage increase certainly can, and in this case did, serve two objectives"—as something in return for the termination of retiree health benefits and to "help[] bridge the wage gap between the two facilities."

*Signing Bonus.* The Company also asserts that the wage proposal was simply a "cash package as a signing bonus" to get the Union employees to ratify the collective bargaining agreement. Nothing in the record backs up this assertion, however; the wage increases were always tied to elimination of retiree health benefits and the procedural requirement of ratification does not sever that link.

*Conclusion.* As we have held, "the facts and complexities of the bargaining process are 'particularly amenable to the expertise of the Board as factfinder,' and 'few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board [that] deals constantly with such problems.'" *Plainville*, 44 F.3d at 1326 (alteration in original) (quoting *Bolton-Emerson, Inc. v. NLRB*, 899 F.2d 104, 108 (1st Cir. 1990)). As explained, the Board's decision in this case is supported by substantial evidence. We therefore affirm the Board's finding that "the strong record evidence . . . establishe[d] that the [Company's] proffered wage increases, shift differentials, equity adjustments, and HAS or 401(k) contributions were 'inextricably linked' to the elimination of 'in-the-box' retiree health benefits."

## B. Subcontracting the Outage Work

In ruling that the Company violated the Act by subcontracting the open/clean/close work on the M116 Project, the Board relied on two of its decisions for the proposition that the strength of the bargaining unit is diluted whenever bargaining unit work is assigned to outside contractors regardless of whether unit employees can do the work. *See Mi Pueblo Foods*, 360 NLRB 1097 (2014); and *Overnite Transp. Co.*, 330 NLRB 1275, *aff'd in relevant part mem.*, 248 F.3d 1131 (3d Cir. 2000) (unpublished). The Board also found that "the decision to subcontract was based, at least in part, on labor costs."

The Company contends that given the unique circumstances of this case, the subcontracting at issue was not a mandatory subject of bargaining. Specifically, the Company

claims that it had no choice but to subcontract the open/clean/close work because it did not have enough unionized employees at the Bruce Mansfield Plant to complete the project in the 56 days allotted and also keep Units 2 and 3 operating.

As the Board noted, "[i]t is well established that a decision to subcontract unit work is a mandatory subject of bargaining where the employer is merely replacing employees in the bargaining unit with employees of a contractor to do the same work under similar working conditions." (citing *Fibreboard Paper Prods Corp. v. NLRB*, 379 U.S. 203, 215 (1964)). But it is equally well established that a business management decision may not be subject to mandatory bargaining, even if it has a direct impact on employment, if the conduct of the business outweighs the benefit to labor management relations. *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 679 (1981).

As this court has noted, the principles from these two well-known decisions "are not meant to be hard and fast rules to be mechanically applied irrespective of the circumstances of the case." *Wehr*, 159 F.3d at 954 (quoting *Shell Oil Co.*, 149 NLRB 305, 307 (1964)). In *Wehr* we observed: "As *Fibreboard* and *First National Maintenance* make clear, a decision to subcontract is not necessarily subject to mandatory collective bargaining; whether such bargaining is mandatory can only be answered by looking to the particular facts presented in the individual case." *Wehr*, 159 F.3d at 953; *see also id.* at 955 ("[B]ecause the decision to subcontract is driven by labor costs does not automatically mean that bargaining over each individual contract is mandatory. This benefit to the collective bargaining process must still be weighed against the burden on the conduct of the company's business." (citations omitted)). Courts, including our own, have carefully balanced these interests. *See, e.g., id.* at 954–55 (holding that bargaining over every routine subcontracting decision would significantly hamper the company's ability to manage its business; thus *Fibreboard* did not apply, even though labor costs were a concern); *Furniture Rentors of Am., Inc. v. NLRB*, 36 F.3d 1240, 1248–49 (3d Cir. 1994) (holding that employer was not required to bargain over subcontracting because decision was based on reduced productivity, damaged product, customer complaints, and employee theft rather than labor costs); *Okla. Fixture Co.*, 314 NLRB 958, 960 (1994) (subcontracting was not a mandatory bargaining subject where the employer's decision was motivated by risk of legal

liability and losing virtually all of its revenue, and subcontractor would serve as a buffer from these risks), *enforcement denied on other grounds*, *NLRB v. Okla. Fixture Co.*, 79 F.3d 1030, 1037 (10th Cir. 1996); *cf. NLRB v. Plymouth Stamping Div. Eltec Corp.*, 870 F.2d 1112, 1116 (6th Cir. 1989) (holding that company's decision to transfer and subcontract its parts assembly operation was a mandatory bargaining subject because the transfer did not significantly alter the nature of the company's business, company incurred no significant capital expenditures, and transfer occurred shortly after company unsuccessfully sought economic concessions from the union).

Although we recognize that "the Board's decision as to exactly which disputes are mandatory bargaining subjects is entitled to 'considerable deference,'" *Plymouth Stamping*, 870 F.2d at 1115 (citation omitted), we think that the Board inflexibly applied *Fibreboard* to the facts of this case, failing to conduct the balancing test required by *Fibreboard*, *National Maintenance*, and *Wehr*. Here, unlike *Fibreboard*, the Company was not merely substituting non-unit workers for bargaining unit employees to perform the open/clean/close work because it "was concerned with the high cost of its maintenance operation." *See Fibreboard*, 379 U.S. at 213; *see also id.* at 224 (Stewart, J., concurring) (joining the Court's judgment "because all that is involved is the substitution of one group of workers for another to perform the same task in the same plant under the ultimate control of the same employer"). Rather, the Company made a realistic assessment that it did not have adequate bargaining unit staff to complete the M116 Project on time, while simultaneously keeping Unit 2 and Unit 3 operating. There is record evidence to support the Company's claim that all employees in the bargaining unit continued to work at least (and more than) 40 hours a week. The Company presented evidence that bargaining unit employees performed a whopping 16,000 hours of overtime while GE completed the M116 Project. Hiring a huge crop of new bargaining unit members to perform the discrete, infrequent task would have also meant having to lay off most of them on Day 57. Furthermore, contrary to the Board's finding, the record reflects that the subcontracting work cost the Company an *additional* $3 million to have GE perform the task. A September 10, 2015 memo states that "The GE proposal to perform the [open/clean/close] labor was revisited and an additional $1.5M Capital and $1.5M in O&M would be needed to pay GE to perform the [open/clean/close] labor."

The Board does not dispute that all bargaining unit employees were fully employed, even overemployed, during the M116 Project or the 16,000-hour-overtime number on appeal. Instead the Board claims that the duty to bargain was "triggered by" the "not hypothetical concerns" that "subcontracting could potentially affect the size of the unit or dilute the union's strength." To substantiate those concerns, the Board cites Cookson's testimony that the unit had shrunk by 23% over the last five years, with more reduction expected through attrition. Moreover, during collective bargaining negotiations the Company proposed resource sharing and using more mobile maintenance employees—employees who would be capable of performing the turbine outage work—in order to reduce costs.

But any attenuated benefit to the collective bargaining process is vastly outweighed by the Company's obligation to accomplish an "unprecedented amount of work" requiring a surge of workers for a discrete project on a short timetable. In other words, the decision to subcontract the M116 Project is properly characterized as a business management decision, driven by the Company's responsibility to keep its generating units in working order, while continuously offering full service, or face penalties. In short, a non-labor-cost reason motivated the subcontracting decision—the need for a large, temporary, workforce to complete the Outage in 56 days to avoid penalties. That decision was therefore a matter of core entrepreneurial concern outside the scope of bargaining. *See First Nat'l Maint.*, 452 U.S. at 678–79. Thus, the Board erred in holding that the general rule of *Fibreboard* controlled in this situation and that the Company violated the Act by not bargaining over the subcontracting of the open/clean/close work. We therefore decline to enforce the Board's order with respect to this issue.

Given this conclusion, consideration of the parties' remaining arguments (warranty, prior existing terms and past practice, notice, fait accompli) is unnecessary.

## C. Requested Information

Because the Company did not have a duty to bargain over subcontracting with GE, it had no duty to provide the Union with information regarding the wages and material costs paid to GE. *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152 (1956) (holding that the duty to produce

information relevant to a bargaining issue is derivative from the broader statutory duty to bargain in good-faith).  We therefore decline to enforce the uncontested portion of the Board's order.

## IV.  CONCLUSION

For the foregoing reasons, we (1) **AFFIRM** the Board's application to enforce its findings that the Company violated Section 8(a)(5) and (1) when, after impasse, it selectively implemented certain pre-impasse bargaining proposals that were inextricably linked to other proposals not imposed; (2) **REVERSE** to enforce the Board's ruling that the Company violated the Act by subcontracting the turbine/generator outage work without first bargaining with the Union and by extension, **GRANT** the Company's petition for review on this issue; and (3) **REVERSE** the Board's order requiring the Company to supply requested information regarding subcontracting.