NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0145n.06

Case Nos. 19-1054/1090

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 12, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| OZBURN-HESSEY LOGISTICS, LLC, | ) | |
| | ) | |
| *Petitioner/Cross-Respondent,* | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | AND CROSS-APPLICATION |
| | ) | FOR ENFORCEMENT OF AN |
| NATIONAL LABOR RELATIONS BOARD, *et al.*, | ) | ORDER OF THE NATIONAL |
| | ) | LABOR RELATIONS BOARD |
| *Respondents/Cross-Petitioners.* | ) | |
| | ) | |

**Before: BATCHELDER, DONALD, and READLER, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** This is an appeal from a National Labor Relations Board decision finding that a company violated federal labor law. The company seeks review and reversal of that decision while the Board and the intervenor Union seek enforcement. We GRANT the petition, AFFIRM in part, REVERSE in part, and ENFORCE in part.

**I.**

Ozburn-Hessey Logistics (OHL) packs, stores, and ships products for customers. It has four warehouses and 300 employees in the Memphis area. A union-representation election in July 2011 led to a long labor fight between OHL and the Union but ultimately resulted in union certification in May 2013. The Union is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO. This appeal stems from OHL's firing of five employees between May and September 2013, each for a different reason. Those employees were Lauren Keele, Shawn Wade, Nannette French, Stacey Williams, and Jerry Smith, Sr. During those five months, the Union was certified and brought the charges about the firings, but there was no collective bargaining agreement (CBA).

When these events began, OHL had a longstanding time-and-attendance policy that included a progressive-discipline system based on an accumulation of points, culminating in an employee's firing after 12 points. Employees clocked in and out of their shifts and received points for tardiness as well as absence. No one here challenges any aspect of that policy.

On April 22, 2013, OHL replaced its push-button time clocks with touch-screen clocks. It did so unilaterally without collective bargaining. Eight days later, on April 30, Lauren Keele clocked in one minute late. She blamed it on a touch-screen mistake. OHL did not excuse her mistake; it assessed her an attendance point, which brought her total to 13, and fired her.

On May 15, 2013, Shawn Wade was running late to work, so he parked in a visitor parking spot, clocked in on time, and then went back to his car and moved it to the employee lot. By leaving the building during his shift after he had clocked in, Wade violated the time-and-attendance policy at a level that prescribed firing, even for a first offense. OHL fired him.

On May 17, 2013, Nannette French clocked in one minute late returning from her lunch break. OHL assessed her an attendance point, which brought her total to 13, and fired her.

On June 17, 2013, Stacey Williams kissed a coworker at work and OHL decided that proper discipline was a written warning for inappropriate workplace behavior. On June 20, two OHL managers met with Williams to execute the ordered discipline by giving Williams a copy of the written warning. Williams refused it and requested union representation. When the managers explained that he was not entitled to representation at the execution of an already-decided discipline, Williams walked out of the room and refused their repeated requests that he return. Finding this conduct to be unprofessional, inappropriate, and insubordinate, OHL fired him.

In September 2013, OHL identified on its security videos several employees who had left the warehouse without clocking out. It then followed up with a questionnaire to each of them, asking whether they had left the warehouse while clocked in on a specific day or days and, if so,

whether they had obtained permission to leave. When Jerry Smith, Sr. lied by asserting that he had not left the building while clocked in, OHL fired him for lying on the questionnaire.

The Union filed charges with the Board on behalf of these five employees and the Board's General Counsel filed a consolidated complaint pursuant to the National Labor Relations Act, 29 U.S.C. § 160, which led to a hearing before an administrative law judge (ALJ). The ALJ found, as relevant here: that OHL's time-clock upgrade was not a material, substantial, or significant change in the terms and conditions of employment, so it did not violate the Act and, therefore, OHL did not violate the Act by firing Keele; and, also, that OHL did not violate the Act by firing Wade, French, or Smith, Sr., but did violate the Act by firing Williams. The ALJ suggested standard remedies.

On review, the Board held that the time-clock upgrade *was* a material, substantial, and significant change, so OHL violated the Act by upgrading unilaterally and by firing Keele; and that OHL violated the Act by firing Wade, French, Smith, Sr., and Williams. The Board *sua sponte* crafted a remedy with three unusual requirements: that OHL (1) post for three years a notice of the Board's ruling; (2) read the notice aloud, publicly, with OHL's top managers and human-resources officials present for at least one reading; and (3) publish the notice in two publications of broad circulation and local appeal twice per week for eight weeks.

OHL petitioned for review, arguing that the Board erred by ruling for the Union/employees and by *sua sponte* imposing the extraordinary remedies. The Board cross-petitioned for enforcement of its order pursuant to 29 U.S.C. § 160(e). The Union intervened as the prevailing party. *See Auto. Workers v. Scofield*, 382 U.S. 205, 208 (1965).

## II.

Our review of the Board's determination is highly deferential. *FirstEnergy Generation, LLC v. NLRB*, 929 F.3d 321, 328-29 (6th Cir. 2019). We review the Board's factual findings for

3

"substantial evidence on the record considered as a whole." *Id*. at 328 (quoting 29 U.S.C. § 160(f)). "[S]ubstantial evidence is not an exacting standard—it means more than a mere scintilla and only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hendrickson USA, LLC. v. NLRB*, 932 F.3d 465, 470 (6th Cir. 2019) (quotation marks omitted). We review questions of law de novo but grant deference to the Board's interpretation of the Act so long as it is "reasonably defensible." *FirstEnergy*, 929 F.3d at 328 (citation omitted). Under this deference, "[w]e may not displace the Board's choice between two fairly conflicting views, even though [we might] justifiably have made a different choice had the matter been before [us] de novo." *Id.* (editorial and quotation marks omitted). But neither may we "stand back and 'rubber-stamp' Board decisions that controvert the [Act]; instead [we] must carefully scrutinize accusations that the Board failed to abide by precedent." *Id*. (editorial marks and quotation marks omitted).[1]

## A.

OHL says the Board erred by holding that OHL violated NLRA § 8(a)(5) when it unilaterally upgraded its time clocks, and by finding that OHL wrongfully fired Keele. We agree.

OHL argues that its replacement of its old push-button time clocks with new touch screens was not "a material, substantial, and significant change in the terms or conditions of employment," *Ead Motors E. Air Devices, Inc.*, 346 NLRB 1060, 1065 (2006), so it did not violate the Act by making this physical upgrade unilaterally. The difference between the old and new clocks is that the employee now pushes a touch screen rather than a plastic button. OHL relies on Board precedent holding that the change from hand writing time entry on cards to push-button time clocks was not material, substantial, or significant, so that unilateral change did not violate the Act. *Rust*

---

[1] The Board is entitled to summary enforcement of any uncontested portions of its order. *Hyatt Corp. v. NLRB*, 939 F.2d 361, 368 (6th Cir. 1991). Therefore, we do not address those issues here.

*Craft Broad. of New York, Inc.*, 225 NLRB 327, 327-28 (1976). And OHL mocks the Board's statement that the touchscreen system is "significantly more complicated" than the push-button system as not only unsupported by the record but nonsensical in modern society.[2]

The Board's General Counsel argues that the time-clock upgrade was "a material, substantial, and significant change in the terms or conditions of employment," *Ead Motors*, 346 NLRB at 1065, because the touch screen system has a "complicated menu" that takes time for "each separate page to load," and because "pressing a button on a sensitive screen can lead to more mistakes than doing so on a clock with physical buttons." General Counsel's more emphatic argument, however, is that the time clock upgrade also changed the process for an employee to request time off: previously, an employee submitted the request to a supervisor in person, but with the new time clocks, the employee was to submit the request electronically using the touch screen. The new method delays the decision on the request until the supervisor logs into the system and receives it, whereas the old method allowed—though it did not require—the supervisor to make the decision immediately. General Counsel claims that it is "irrelevant that Keele's discharge had nothing to do with the change to leave requests," or that OHL subsequently "reversed part of that change and allowed employees to use paper leave slips again."

The physical change in the time clocks is not a material, substantial, and significant change in the terms or conditions of employment, and—as the ALJ determined—there is no evidence that would support the claim that the touch screens are significantly different from (or more difficult than) the push buttons. Moreover, the physical clocks and the clocking-in function are distinct

---

[2] Both General Counsel and the Union emphasize that the new touch screen clocks came with a 50-page instruction manual, as evidence that they are drastically more complicated. As a practical matter, a new refrigerator comes with a lengthy instruction manual, though even "plug it in and keep the door closed when you're not using it" is probably more instruction than is necessary for functional operation. A new car comes with a 1,000-page instruction manual, but that does not mean that driving the new car is materially, substantially, or significantly different from driving the old one. This particular contention, like this entire claim about the time clocks, appears disingenuous and borderline ridiculous.

from the time-off policy, and the difference is most evident because that policy is no longer even in place. Therefore, the time-off policy (which reasonably could warrant collective bargaining as a material, substantial, and significant change in the terms or conditions of employment) is irrelevant here.

OHL did not violate the Act by physically upgrading the time clocks unilaterally. We vacate the portion of the Board's order holding that it did. *See Rust*, 225 NLRB at 327-28.

OHL argues, alternatively, that even if it violated the Act by upgrading the time clocks unilaterally, the change in time clocks did not cause Keele's firing. OHL fired her for chronic tardiness or absenteeism. She had accumulated 12 points on the day she clocked in late, resulting in her 13th point. The Board speculated that this late clock-in would not have happened with the push button clock, but Keele's testimony was that it could have—she said that she had successfully used the touch screen at least 20 times without error before that day and could have pushed the wrong button on the old push button clock as easily as she did on the touch screen.

The Board's General Counsel recites the events, which are undisputed: Keele approached the clock on time, pressed a wrong button, and then pressed the "home" button to return to the home screen; while she waited for the "home page" to load, time passed and, by the time she pressed the correct button and clocked in, she was one minute late. Relying on precedent that, if an employer's unilaterally imposed policy was a *factor* in the employee's firing, then the firing violates Section 8 (a)(5) and (1) of the Act, *Consec Sec.*, 328 NLRB 1201, 1201 (1999); *see also Orchids Paper Prod. Co.*, 367 NLRB No. 33 (Nov. 20, 2018) (appendix), General Counsel argues that because Keele became late while waiting for the touch screen page to load, whereas the old clocks did not load pages, the new clock was a "factor" in her firing, so it violated the Act.

Because OHL did not violate the Act by upgrading the time clocks unilaterally, that upgrade alone does not render Keele's firing a violation. Moreover, the record does not support a

finding that Keele was late (or fired) due to the touch screen; she was late because she was late. Because Keele had accumulated 13 attendance points, OHL did not violate the Act by firing her.

**B.**

OHL claims that the Board erred by finding that it violated NLRA § 8(a)(3) and (1) by firing Stacey Williams and Shawn Wade. We do not agree.

Stacey Williams

OHL argues that Williams did not engage in protected union activity because he had no right to the representation he was demanding, so his insubordination was not protected. The Act entitles a union employee to union representation at an investigatory interview, *NLRB v. J. Weingarten Inc.*, 420 U.S. 251, 267 (1975), but not "at a meeting with his employer held solely for the purpose of informing the employee of, and acting upon, a previously made disciplinary decision," *Baton Rouge Water Works Co.*, 246 NLRB 995, 997 (1979); *Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1142 (D.C. Cir. 2011). Williams had no right to representation at the imposition of the previously decided discipline (i.e., while being handed the written warning), and no one here legitimately contends that he did. Instead, the Board said that his reasonable but mistaken belief in his right to representation meant that his insubordination was protected activity.

The Board cited *Omni Commercial Lighting, Inc.*, 364 NLRB No. 54, 2016 WL 3913693 (July 19, 2016), for the proposition that "the *Interboro* doctrine compels the conclusion that an honest and reasonable invocation of a collectively bargained right constitutes concerted activity, regardless of whether the employee turns out to have been correct." *Id*. at \*4 (quoting *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 840 (1984), and referring to *Interboro Contractors, Inc.*, 157 NLRB 1295, 1298 (1966)). But OHL cites Board precedent holding that, "[i]n the absence, as here, of a [CBA], the *Interboro* doctrine is inapplicable." *K-Mart Corp.*, 341 NLRB 702, 704 n.6 (2004). Thus, OHL argues that the Board misapplied its precedent, and, under proper

7

application, Williams's reasonably mistaken belief was not enough because OHL and the Union did not yet have a CBA. Moreover, OHL points out, the record contains no evidence to support a finding that Williams's beliefs were reasonably or honestly held. Certainly, the Board did not cite any such evidence.

OHL argues, alternatively, that even if Williams had been engaged in protected activity by demanding union representation, OHL did not fire him for demanding union representation; it fired him for unnecessary insubordination. This disagreement about the reason or motivation for Williams's firing, OHL argues, invokes the burden shifting test under *Wright Line Inc.*, 251 NLRB 1083, 1089 (1980). *See also Airgas USA, LLC v. NLRB*, 916 F.3d 555, 561 (6th Cir. 2019). Because the Board did not apply *Wright Line*, OHL continues, the analysis was inapt; and, if it had applied *Wright Line*, it would have concluded that OHL justifiably fired Williams.

The Board's General Counsel emphasizes that Williams's mistaken belief that he had a right to union representation was a *reasonable* mistake and, because it was reasonable, it was protected under *Interboro*, 157 NLRB at 1298, even though it was mistaken. General Counsel argues that the absence of a CBA does not matter here—and therefore does not displace *Interboro*, *see K-Mart*, 341 NLRB at 703 n.6—because Williams was not attempting to invoke *contractual* rights under a CBA, he was attempting to invoke *statutory* rights, so the existence or absence of a CBA was irrelevant. General Counsel concludes that Williams's demand for representation was protected activity even though he had no right to that representation and OHL fired him for "misconduct during otherwise protected activity," so the proper test is from *Atlantic Steel*, *see Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 547 (6th Cir. 2016), rather than *Wright Line* as OHL argues. The *Atlantic Steel* test depends on a balancing of four factors: (1) the place of the misconduct; (2) the subject matter of the disagreement; (3) the nature of the employee's misconduct; and (4) whether the misconduct was, in any way, provoked by the employer's unfair

labor practice. *Atl. Steel Co.*, 245 NLRB 814, 816 (1979). The interaction between Williams and the two managers began in a conference room and, when he walked out, ended at his work station. The managers tried to give Williams a written warning, but Williams refused to accept it until he had union representation present. The reasonableness of Williams's belief that he needed union representation when he took physical possession of a piece of paper with a written warning on it is questionable; the legitimacy of that belief (that he was *entitled* to such representation) only slightly less so; and his approach of leaving the conference room and ignoring or refusing repeated demands that he return, rather than accepting the paper and filing charges about the process, was clearly insubordinate. But based on the record, at no point was Williams provocative, hostile, or profane. In fact, he was calm while the managers were provocative.

While the managers were ultimately correct—Williams had no right to representation and was insubordinate to a degree that would reasonably justify his firing—they (like Williams himself) could have gone about it differently. Just as Williams could have accepted the paper and filed charges about the process, the managers could have proposed additional discipline (firing) for Williams's insubordination, or merely for his refusal to accept the prior discipline (paper warning), and held a meeting at which he could have raised his union-activities and right-to-representation claims, perhaps with representation, both of which contentions would likely have failed and led to his ultimately being fired anyway. Admittedly, this is cumbersome to the extreme, but that is the nature of a union shop, particularly one with so much established friction and so many lingering disputes.

The Board was not wrong to find that OHL violated the Act by firing Williams.

<u>Shawn Wade</u>

OHL argues that it was not aware of Wade's union activity and that no record evidence shows that it was. At the evidentiary hearing, Wade testified that he was standing in an OHL

parking lot signing a union card when OHL Vice President Randall Coleman drove past and, by looking at Wade in the car's rearview mirror, saw what Wade was doing. Coleman testified that this did not happen; that he did not know Wade, did not see Wade, and could not have known from the circumstances as Wade described them that Wade was signing a union card. Nor was Coleman involved in Wade's firing. Given Wade's story, it is not surprising that the ALJ believed Coleman and disbelieved Wade. The ALJ found no evidence that OHL knew about Wade's union activity when it fired him for leaving the warehouse to move his car after he had clocked in to work. But the Board disagreed and, imputing Coleman's supposed knowledge universally to OHL, said "that circumstantial evidence supports an inference, which we draw, that [OHL] knew of Wade's union activity." That circumstantial evidence was the flurry of union activity at the facility following the Union's certification and that, when in the parking lot signing the union card, Wade was with Anita Wells, an outspoken union advocate. OHL argues that the Board breached precedent by overturning the ALJ's credibility findings, *see Standard Dry Wall Prod., Inc.*, 91 NLRB 544, 545 (1950) ("we do not overrule a Trial Examiner's resolutions as to credibility except where the clear preponderance of *all* the relevant evidence convinces us that the Trial Examiner's resolution was incorrect"), and that the evidence was insufficient regardless.

The Board's General Counsel argues that it was not required to prove *directly* OHL's knowledge of Wade's union activity but could rely on "circumstantial evidence from which a reasonable inference of knowledge may be drawn." *Coastal Sunbelt Produce, Inc.*, 362 NLRB 997, 998 (2015) (citing *Montgomery Ward & Co.*, 316 NLRB 1248, 1253 (1995)). Under this *Montgomery Ward* test, the Board can infer knowledge based on: (1) the timing of the adverse action; (2) the company's general knowledge of union activities; (3) the company's animus against the union; and (4) disparate treatment or apparent pretext. *Id.* Here, OHL fired Wade the very next day after he signed the card, was well aware that employees throughout the facility were

signing union cards in the wake of the recent union-formation election results and pending certification, and held a demonstrable animus for the Union, having fought the election, the certification, and numerous labor complaints for the past two years. Finally, two employees testified that they personally—and virtually all employees generally—routinely left the building to go to their cars, without clocking out and without consequence,[3] and General Counsel produced records of two specific employees who received a warning and one attendance point, respectively, for a first-time offense of this exact same act of clocking in and then leaving the building to move their cars. Wade was the only employee whom OHL had fired for this.

A full analysis of this claim requires the *Wright Line* burden-shifting framework. *See Airgas USA*, 916 F.3d at 561 (applying *Wright Line*, 251 NLRB 1083 (1980)). Under the first step, General Counsel must make out a *prima facie* case of discrimination by demonstrating: (1) protected activity; (2) the company's knowledge; and (3) causation—that the company fired the employee because of the protected activity. *Id*. (citations omitted). If General Counsel makes out a *prima facie* case, the burden shifts to the company to prove by a preponderance of the evidence that it fired the employee for a reason unrelated to any protected activity. *Id.* If the company cannot meet this burden, or if its proffered reason is determined to be disingenuous or pretextual, the Board need not consider whether the company would have fired the employee anyway but may decide the claim based on its assessment of the General Counsel's proffered evidence. *Id.*

Here, assuming General Counsel made a *prima facie* case (i.e., assuming circumstantial evidence imputed knowledge to OHL of Wade's protected activity), OHL's response is that it fired Wade for stealing company time by clocking in and then going to move his car. But, as just discussed, General Counsel presented testimony and evidence at the hearing that Wade's firing under these circumstances was a one-time or first-time event that was inconsistent with or

---

[3] *See*, *e.g*., the discussion of Smith, Sr., *infra*.

contradictory to OHL's ordinary treatment of this apparently routine or at least recurrent conduct. This renders OHL's proffered reason disingenuous or pretextual. The only question is OHL's knowledge and the Board's determination that the evidence proved that knowledge.

Even accepting the ALJ's credibility determinations—and findings that Coleman did not see Wade, know Wade, or know what he would have been doing—the Board imputed knowledge based on circumstantial evidence and application of the *Montgomery Ward* test. As with the prior claim, the overall labor friction affects the finding of circumstantial evidence here. The Board was not wrong to find that OHL violated the Act by firing Wade.

## C.

OHL claims that the Board erred by finding that OHL violated NLRA § 8(a)(3) and (1) by firing Nanette French and Jerry Smith, Sr. We agree.

Nannette French

OHL argues that it was not aware of French's union activity and no record evidence shows that it was, nor does any record evidence show disparate treatment applicable to French.[4] To show OHL's knowledge of her union activity, French claimed that two OHL managers saw her distributing union cards, but when one denied it, the ALJ disbelieved French and believed the manager: "I have concluded that [the manager]'s testimony was more reliable than French's and have credited [that] denial." The other manager did not testify, but the ALJ explained: "[E]specially because of my concerns about French's testimony, I have concluded that credible evidence did not establish that [this other manager] saw French."[5] Therefore, the ALJ found that

---

[4] The Board's dissenting member found that the "record belies" an inference that OHL knew of French's union activity because: "[1] French was not openly supportive of the Union prior to May 14, [2] the judge found that neither [the first manager] nor [the second] witnessed French's union activity on May 14, and [3] the record reveals that [OHL] had no other potential source of knowledge about French's union activity."

[5] The ALJ pointed out that General Counsel could have subpoenaed the second manager to testify but did not; instead he called the two employees who were with French at the time. Despite their efforts, neither could support her claim that the two managers had seen her, nor was their testimony even consistent. These two witnesses—both

"no credited evidence establishes that [OHL] knew that French had engaged in protected activities," but the Board applied the *Montgomery Ward* test[6] to find otherwise, explaining that, "[b]ased on the timing of French's discharge, [OHL]'s general knowledge of union activity, [OHL]'s antiunion animus, and the disparate treatment of French, we infer that [OHL] knew of her open union activity" when it fired her. OHL argues that the Board breached its precedent, which holds that such ambiguous conditions do not prove knowledge. *See Gruma Corp*., 350 NLRB 336, 338 (2007) ("The judge specifically credited [the manager]'s testimony that she had no knowledge of [the employee]'s prior union activity . . . [and] we agree with the judge that the record as a whole does not provide a basis for inferring knowledge."); *Amber Foods, Inc.*, 338 NLRB 712, 714 (2002) (explaining that there was no record evidence that the company knew of the employee's union activities and rejecting the ALJ's theory that "because the [company] knew that 'a substantial number' of employees had gone to the Union, the knowledge requirement as to [this] specific [employee] has been satisfied" (internal quotation marks omitted)).

The dispute here is ultimately about the Board's finding of disparate treatment, which supported its finding of knowledge. There is no real dispute about timing (OHL fired French three days after she distributed union cards), OHL's general knowledge of union activities, or OHL's animus against the Union. As for disparate treatment, the ALJ determined that the documents in evidence did not reveal "any pattern of employees clocking in late but receiving no points," so "the evidence presented does not establish disparate enforcement." But the Board disagreed, finding that, "[d]espite its written policy, [OHL] generally did not discharge employees for

---

OHL employees—could not identify the managers, and "the inconsistencies in the testimony raise doubts about its reliability[,] . . . doubts [that] extend to the testimony of all three witnesses, [these two] and French." Moreover, because "other parts of French's testimony, not related to the allegations considered here, also bear on the weight it should be accorded," the ALJ concluded that "I do not have confidence in the accounts given by French."

[6] *See Coastal Sunbelt*, 362 NLRB at 998 (citing *Montgomery Ward*, 316 NLRB at 1253) (holding that the Board can infer knowledge based on: (1) the timing of the adverse action; (2) the company's general knowledge of union activities; (3) the company's animus against the union; and (4) disparate treatment or apparent pretext).

reaching 13 attendance points," but "has frequently allowed employees to accumulate far more than 13 points." This finding was not based on evidence in the record presented to the ALJ at the evidentiary hearing, however, as the ALJ had expressly excluded that evidence. Instead, the Board drew these facts from the prior NLRB opinion of *Ozburn-Hessey Logistics, LLC*, 362 NLRB 1532, 1554 (2015), which identified seven individual OHL employees by name and the attendance points each had accumulated before being fired: all exceeded 13 points, but all of those events occurred between January 2009 and November 2011. General Counsel insists that "[t]he Board may properly consider its prior factual findings as substantive evidence," which sounds reasonable despite the questionable legal citations in its brief, but this evidence is not determinative here.[7]

In short, we need not decide whether these seven instances of OHL's lax enforcement of the policy several years ago were sufficiently representative of its contemporaneous practice, so as to show that its enforcement of the policy to fire French was necessarily "disparate." Without digressing into the relevance of those historical instances, the most relevant comparison was to Lauren Keele. Just four days earlier, OLH fired Keele under the exact same circumstances—she was one minute late on the time clock and accrued her 13th point. Keele, however, had not engaged in any union activities and never claimed that she was fired for doing so. Because it fired Keele, OHL *had to* fire French for committing the exact same violation just four days later in order to enforce its policy in an evenhanded and nondiscriminatory manner. To do otherwise would have created an unjustifiable disparity (disparate treatment) between Keele and French.

The Board's decision does not abide precedent, does not have support in the record, and is not rational. OHL did not violate the Act by firing French.

---

[7] Therefore, we need not consider or address the ALJ's exclusion of this information from the present record or the Board's omission of any reference to that explicit exclusion.

Jerry Smith, Sr.

OHL denies the accusation that the questionnaire was a pretext to fire Smith, Sr. for union activities by reasoning that: because nine employees received the identical questionnaire, if it were a pretext then it must have been a pretext for firing all nine. But there is no evidence of any union activity by any of the other eight. Also, while OHL could have already known that Smith, Sr. did not have permission to leave the building, the record does not reveal any such knowledge, so there is no evidence to disprove OHL's explanation that the questionnaire was a legitimate opportunity for Smith, Sr. to explain or justify his apparent violation. And OHL could not have known before distributing the questionnaires that Smith, Sr. would lie when answering it.[8]

The ALJ determined that OHL would have fired Smith, Sr. for lying on the questionnaire regardless of his union activities. But the Board rejected that determination and instead speculated that OHL used Smith, Sr.'s lie on the questionnaire as a pretext to fire him because he "was the Union's primary organizer." But Smith, Sr. was not the Union's primary organizer. Given the Board's deep knowledge of the union activities at OHL, from numerous companion cases as well as the record here, this was an odd misstatement.

General Counsel argues that the Board was correct to conclude that OHL had not proven that it would have fired Smith, Sr. for lying regardless of his union activities because OHL "has not shown that it typically disciplines or discharges employees for lying on an investigative questionnaire."[9] But, as the ALJ found, OHL asserted several reasons why it would:

> [OHL] had not only a legitimate but also a compelling interest in assuring that
> employees gave truthful answers during any internal investigation because actions

---

[8] The Board's dissenting member explained that "Smith Sr. was the only one of the nine employees who received questionnaires who lied about leaving the building during worktime . . . [and the only one who] did not express uncertainty and did not recant his lies."

[9] The Board casually cited "at least one instance [when OHL] concluded that an employee had lied on a questionnaire but took no action," as proof that it would not otherwise fire an employee for lying on an investigative questionnaire. But in that incident, OHL did not have *proof* that the employee had lied, it merely *believed* that she had lied, whereas here OHL had conclusive proof that Smith, Sr. lied. That is not an equivalent situation.

15

> based on those answers could harm innocent employees if the answers were untrue. Likewise, because [OHL]'s employment actions potentially could result in legal liability, it had a strong business interest in assuring that employees responded truthfully. Moreover, had [OHL] failed to take action, it potentially would undermine the effectiveness of the policy in the future.

The Board retorted that "[a]lthough we do not disagree with this general justification for a rule against lying in investigations, it carries little weight here." Presumably, the Board meant that "it carries little weight here" because the Board had concluded that OHL does not "typically discipline or discharge employees for lying on an investigative questionnaire."

Even if correct, this was neither a typical investigation nor a typical questionnaire. OHL had suspicions and concerns that some employees were leaving the warehouse without clocking out, which meant that it was paying them for not working and the work was not getting done. OHL reviewed its security video, identified nine apparent violators, and gave them each an opportunity to confess or explain themselves. There is no basis to taint this investigation with any anti-union animus because the record contains no evidence of any union activities by any of the other eight employees, each of whom apparently took advantage of the questionnaire to confess or explain themselves. Only Smith, Sr. lied about leaving the building, and he did so without expressing any uncertainty or recanting when pressed. The surveillance video proved, irrefutably, that this was a lie. OHL fired him for lying. By rewarding honest answers to the questionnaire (with lesser discipline) and punishing dishonest answers harshly (with firing), OHL sets a clear incentive or motivation for employees to answer the questionnaires honestly, better protecting innocent employees, its own future liability, and the application of the investigative policy in the future. The Board's decision would set a policy that an employee who engages in union activities may do as he pleases and, when caught, lie to the employer without consequence. That is insupportable.

The Board's decision does not abide precedent, does not have support in the record, and is not rational. OHL did not violate the Act by firing Smith, Sr.

**D.**

OHL claims that the Board erred when imposing remedies in this case. We cannot agree.

OHL argues that the *sua sponte*, extraordinary remedies are unlawful and beyond the Board's statutory authority because they are punitive, were not litigated or even discussed, and lack any standard for their imposition. OHL concedes that, under NLRA § 10(c), the Board has broad remedial powers, but insists that the remedies may not be "punitive," as they are here.

> [Section 10(c)] does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because [it] is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 235-36 (1938); *accord HTH Corp. v. NLRB*, 823 F.3d 668, 680 (D.C. Cir. 2016). Here, the Board held that OHL violated the Act by unilaterally upgrading the time clocks and by firing some employees for, at least in part, engaging in protected union activities. Taken in isolation, those are not particularly egregious violations. Thus, OHL faults the Board for failing to explain how the severe public-posting, public-reading, and public-publication requirements relate to or would remedy those violations. Specifically, the Board did not explain why the normal 60-day posting was inadequate. Nor did it explain the purpose of forcing managers and supervisors to attend a public reading of recriminations for offenses committed several years ago, other than to expose those managers to ridicule, embarrassment, or humiliation. Similarly, the benefits of publishing those recriminations in local newspapers is not evident; it would publicly shame OHL about activities that are over and remedied but would do little to improve or further the labor-management atmosphere or bargaining relationship.

General Counsel responds that the Board did not, nor should we, consider only the present violations in isolation. The Board has imposed enhanced remedies against OHL in prior cases, but those remedies have proven ineffective. Because OHL has continued to violate the Act over several years, a posting period longer than the normal 60 days was warranted. Moreover, because

17

it is OHL's managers and supervisors who have continued to violate the Act for the past several years, the public readings were warranted to ensure that the managers and supervisors were being fully informed of the employees' union rights. Finally, publication was warranted to ensure that prospective employees would be aware of OHL's history of unfair labor practices, their rights to oppose such practices, and that the Board has protected those rights.

As already mentioned, the Board has broad discretion to fashion remedies. "[W]e will not disturb a Board's remedial order unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. ADT Sec. Servs., Inc.*, 689 F.3d 628, 635-36 (6th Cir. 2012) (*quoting Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)) (quotation marks omitted); *see also ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323-24 (1994). The Board's proffered reasons and justifications refute the claim that these remedies were a "patent attempt" at something other than furtherance of the Act, such as public ridicule, embarrassment, or humiliation, or were strictly punitive. We accept that the Board intended legitimate remedial purposes and, therefore, we must uphold them.

### III.

For the foregoing reasons, we GRANT OHL's petition for review, AFFIRM the Board's decision in part, REVERSE the Board's decision in part, and GRANT the Board's cross-petition for enforcement in part.

**CHAD A. READLER, Circuit Judge, dissenting in part.** I join the Court's opinion in all respects, except for Section D, which affirms the enhanced remedies imposed by the National Labor Relations Board.

Those penalties were historic. In the Board's 85-year existence, only one set of previously imposed penalties exceeds this one. The history underlying their selection was equally unusual— the Board imposed the penalties *sua sponte*, when no party requested them, when the ALJ did not recommend them, and over Chairman Ring's vigorous dissent.

Setting all of this aside for the moment, simply on the thrust of our decision reversing several findings of the Board, I would vacate the remedies imposed and remand the matter back to the Board to recalibrate the appropriate penalty. The math alone requires that outcome. Of the approximately 55 violations alleged in the Regional Director's complaint that initiated the underlying Board proceeding, the ALJ determined that only 14 (or just over 25 percent) were meritorious. The Board found four additional violations, bringing the total to 18. But many of the 18 were rather insignificant in nature. One, for example, arose from a unit of OHL employees being encouraged, perhaps mandated, to do "jumping jacks" and other stretching exercises. Of the relatively more severe violations, OHL appealed six of them to our Court. We have now reversed four of the six—67 percent of the violations appealed, and 22 percent of the total count.

With much of the basis for the Board's original penalty having eroded, both in number and weight, we should remand the matter to allow the Board to calibrate a penalty consistent with the current record, not the erroneous one it previously relied upon. *See, e.g.*, *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1175 (D.C. Cir. 1998) (partially overturning the decision of the Board and remanding to reconsider the appropriate remedies); *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 122 (2d Cir. 2001) (remanding to the Board to refashion remedies after finding portions of the Board's order unduly burdensome on the employer). We routinely do so in the

criminal sentencing context. *See United States v. Ehle*, 640 F.3d 689, 699 (6th Cir. 2011) (remanding for resentencing where one of two child pornography convictions was reversed on appeal); *see also Pepper v. United States*, 562 U.S. 476, 507 (2011) ("Because a district court's original sentencing intent may be undermined by altering one portion of the calculus, an appellate court when reversing one part of a defendant's sentence may vacate the entire sentence so that, on remand, the trial court can reconfigure the sentencing plan . . . .") (internal quotations and alterations omitted)). We do the same in the civil damages context. *See Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 749 (6th Cir. 2019) (vacating damages award and remanding for the district court to reassess damages where district court improperly included certain employees in collective action); *United States ex rel. Wall v. Circle C. Constr., L.L.C.*, 697 F.3d 345, 350 (6th Cir. 2012) (remanding to the district court to recalculate damages where erroneous reliance on certain testimony impacted damages award under the False Claims Act). And we do the same in the context of civil penalties. *See R & W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 177–78 (5th Cir. 2000) (remanding to the Commodity Futures Trading Commission for recalculation of penalties in light of the unreasonable nature of the original penalties and the failure to consider mitigating evidence). Why not the same here?

But even on its own terms, the Board's remedial order was unjustified in the first instance. While the majority opinion is correct that we will not disturb a remedial order lightly, that does not mean we need not examine whether the Board provided sufficient reasoning and imposed non-punitive remedies. *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 935 (D.C. Cir. 2005) (Henderson, J., dissenting). That examination reveals that two of the three appealed penalties imposed by the Board were neither recommended by the ALJ nor requested by the parties: one, an extended notice period of three years, and two, notice in two publications, twice a week for eight weeks. The ALJ did recommend a third remedy: notice-reading by a Board agent,

consistent with previous Board orders. Yet once again, the Board seemingly knew better. It added to that penalty a requirement that OHL's supervisors and managers attend a reading, that OHL supply sign-in sheets to confirm their attendance, and that copies of those sign-in sheets be distributed to the Regional Director upon request.

With the Board having imposed these penalties in the absence of a request or recommendation to do so, one would expect the penalties to enjoy a settled pedigree. Far from it. As counsel for the Board conceded, this collection of penalties has been eclipsed only once, in *HTH Corp. d/b/a Pacific Beach Hotel*, 361 N.L.R.B. 709, 714 (2014), *enforced in relevant part sub nom. HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016). Considering the Board's 85-year history, that is saying something.

And to compare *Pacific Beach* to this case gives analogy a bad name. The conduct there, Chairman Ring observed, was "so outrageous as to render it all but *sui generis*." Pacific Beach had an over decade-long history of disobedience. Its laundry list of violations included: interfering with multiple union elections; threatening, coercing, unlawfully disciplining, and discharging employees; manipulating wage increases and promotions to impact union elections; repeatedly bargaining in bad faith; unlawfully withdrawing recognition from the union; and routinely making changes to its employees' terms and conditions of employment without bargaining.

Add to that potpourri of misconduct the fact that Pacific Beach's prior penalties included a civil contempt order and multiple federal court Section 10(j) injunctions enjoining ongoing conduct. On a number of occasions, Pacific Beach intentionally violated both court and Board orders. Chairman Ring highlighted one colorful example: when a Pacific Beach vice president was told that the hotel made certain changes that violated a Section 10(j) injunction issued by a federal judge, the vice president responded, "[f]uck the judge. He's wrong . . . [the changes are] not illegal unless I go to jail."

OHL's history of recalcitrance is comparatively thin. The company's misconduct largely occurred within a short timeframe, primarily from 2012 and 2013, when the union accelerated its efforts to organize OHL employees. Those efforts did not bear fruit until May 24, 2013, when the union was certified, and OHL was not instructed to begin the collective bargaining process until 2016. *See Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 213 (D.C. Cir. 2016). While OHL engaged in other violations, those were not resolved until 2015, well after the conduct at issue in this proceeding. *See Ozburn-Hessey Logistics, LLC*, 357 N.L.R.B. 1632 (2011), *enforced sub nom. Ozburn-Hessey Logistics, LLC v. NLRB*, 609 F. App'x 656 (D.C. Cir. 2015). In other words, OHL was punished here for conduct that largely preceded formal unionization, preceded any collective bargaining, and preceded other related findings and orders of the Board.

Today's case, then, has little in common with *Pacific Beach.* Yet that is all the NLRB relies on to justify this extraordinary combination of penalties. In equating this case to *Pacific Beach*, the Board made much of the fact that OHL had been before the Board five times. But as Chairman Ring observed, two of those instances were for conduct that occurred *after* the events in this case, making them poor candidates for enhancing this penalty. *See Ozburn-Hessey Logistics, LLC*, 361 N.L.R.B. 921 (2014); *Ozburn-Hessey Logistics, LLC*, 362 N.L.R.B. 1532 (2015). A third involved a "technical refusal-to-bargain violation committed to obtain appellate review of an underlying representation case." And entirely unlike Pacific Beach, OHL complied with the orders issued against it. *Compare Pacific Beach Hotel*, 361 N.L.R.B. at 710 n.10 ("Fuck the judge. He's wrong . . . [the changes are] not illegal unless I go to jail.") (alterations in original).

In imposing historic remedies on OHL, the Board leaned on the notion that the penalties were necessary to "dispel the lingering effect of [OHL's] unfair labor practices" and curtail the "persistent repetition of the same unfair labor practices." But it bears repeating that the conduct at issue here took place before or at the same time as many of the other violations for which OHL

has been punished. *See, e.g.*, *McKinney v. Ozburn-Hessey Logistics*, LLC, 875 F.3d 333, 337 (6th Cir. 2017) (relevant conduct occurred in late 2013); *Ozburn-Hessey Logistics, LLC v. NLRB*, 939 F.3d 777, 782 (6th Cir. 2019) (relevant conduct occurred between late 2013 and 2016). In other words, this is not a case of OHL not learning its lesson and requiring escalating remedies. It is an example of conduct from a similar period coincidentally being litigated in separate proceedings.

So far from reflecting an unwillingness to adhere to prior orders, the violations here merely reflect OHL's vigorous (sometimes too vigorous) efforts to prevent unionization. OHL enjoys the right to campaign against unionization, just as a union enjoys the right to promote the concept. *See, e.g.*, *Hendrickson USA, LLC. v. NLRB*, 932 F.3d 465, 473–74 (6th Cir. 2019) (finding that certain employer statements were lawful advocacy rather than threats). In some instances, OHL exceeded permissible bounds. Setting aside the fact that some of the more significant violations have now been reversed, all agree that some penalty was appropriate. But a historic, nearly unprecedented one?

All of this leads me to the inescapable conclusion that the Board imposed these extreme remedies to punish OHL simply for the number of times the company appeared before the Board, even in the absence of a recidivist past. Indeed, counsel for the Board acknowledged at oral argument that the amount of litigation needed to resolve the related violations "infected the Board's entire view of the case." But the Board is not permitted to fashion remedies meant to punish rather than to remediate. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 235–36 (1938).

*Pacific Beach*, Chairman Ring aptly noted, was a "once-in-a-generation" event. Yet far from a generation, just four years later the Board was back at it, punishing OHL in monumental fashion. One might see why *Pacific Beach* deserved a historic penalty. But there is no reason, other than a punitive one, to put OHL in that same notorious class. *See R & W Tech. Servs., Ltd.*,

205 F.3d at 177–78 (vacating unprecedented penalty imposed by CFTC).  On that basis, I dissent from the remedy portion of the Court's opinion.